USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __10/14/2020____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

CARLO ESTIME,

               Defendant.

19-cr-711 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    Defendant Carlo Estime ("Defendant" or "Estime") is charged in a one-count indictment, filed on October 7, 2019, with conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 841(b)(1)(B). (Indictment, ECF No. 10.) Presently before the Court is Defendant's first motions to: (a) suppress certain statements made to law enforcement agents; (b) destroy copies of certain electronically stored information ("ESI") obtained from Defendant's cellphones and return both cellphones to Defendant; (c) controvert and suppress portions of the search warrant targeting one of Defendant's cellphones; (d) direct the Government to provide pre-trial notice of evidence the Government intends to introduce at trial; and (e) seek leave to file additional future motions. (ECF No. 21.) Defendant also seeks a pre-trial evidentiary hearing to determine the voluntariness and admissibility of post-arrest statements which the prosecution seeks to introduce at trial. (ECF No. 23 at 14.)

    For the following reasons, Defendant's motions are GRANTED in part and DENIED in part.

## BACKGROUND

### I.   Factual Background

    The following facts are drawn from the criminal complaint filed in this matter, the indictment, and the parties' submissions.

### A.     The Underlying Investigation

On or about August 5, 2019, Customs and Border Protection ("CBP"), identified a package in San Juan, Puerto Rico, destined for Caleb Jean-Pierre ("Jean-Pierre") at an address in Chestnut Ridge, New York (the "Jean-Pierre Premises"), labeled as a dominos table, and containing "a white powdery substance, which tested positive for cocaine."  (Criminal Complaint ("Compl."), ECF No. 1, ¶ 5-6; *see also* Def. Mem. of Law in Supp. of First Mot. to Suppress ("Def. Mem."), ECF No. 23, at 2-3; Gov't Mem. of Law in Opp. to Def. First Mot. to Suppress ("Gov. Opp."), ECF No. 24, at 26.)  After intercepting this package, law enforcement agents removed the cocaine from the package and replaced it with a "sham material made up to look like the white powdery substance" (the "Sham Package").  (Compl. ¶ 7; *see also* Def. Mem. 3; Gov. Opp. 26.)

Two days later, on or about August 7, 2019, the Government applied for an anticipatory search warrant for the Jean-Pierre Premises that was issued by the Honorable Paul E. Davison later that day.  (Compl. ¶ 8.)  The warrant provided, among other things, that law enforcement could search the Jean-Pierre Premises after an adult at that location accepted delivery of the Sham Package.  (*Id.*)  On August 8, 2019, a law enforcement agent dressed as a DHL delivery person delivered the Sham Package to Jean-Pierre at the Jean-Pierre Premises.  (Compl. ¶ 9; *see also* Def. Mem. 3; Gov. Opp. 26.)

After delivering the Sham Package, law enforcement agents surveilled the Jean-Pierre Premises for approximately one hour before they witnessed Defendant enter the Jean-Pierre Premises.  (Compl. ¶ 9.)  Prior to Defendant's arrival, at 11:03 a.m., Jean-Pierre sent a text message to Defendant stating, "Yo shit here," to which Defendant later responded, "pulling up."  (ECF No. 23-1 (Def. Ex. A), at CE_000109.)  Shortly after his arrival, Defendant exited the Jean-Pierre Premises carrying an opened Sham Package.  (*Id.*; *see also* Gov. Opp. 26.)  Moments later, at approximately 11:39 a.m., law enforcement agents arrested Defendant and Jean-Pierre.  (*Id.*; Def.

Mem. 3.)  At this time, law enforcement agents seized two cellphones from Defendant's person:  a rose gold iPhone with the IMEI 353094102870587 and a grey iPhone with the IMEI 353289077130617.  (Gov. Opp. 14; Def. Mem. 3; ECF No. 23-2 (Def. Ex. B), at CE_000130.)

### B.    The Post-Arrest Confinement of Defendant and His Non-Mirandized Statements

Following Defendant's arrest, he was transported to Rockland County Sheriff's Office (the "RCSO"), 55 New Hempstead Road, New City, New York.  (Def. Mem. 4; Gov. Opp. 2; ECF No. 24-1 (Bauer Deposition).)  At RCSO, Defendant was initially monitored by RCSO Detective Robert Moger ("Det. Moger") in a room referred to by both parties as the "Blue Room."  (Gov. Ex. A; *see also* ECF No. 26-1 (Estime Aff.) ¶¶ 16-19.)  Defendant submitted an affidavit stating that the Blue Room "was a small room without windows" and that "the temperature in the room was low[.]" (Estime Aff. ¶¶ 16-17.)

At approximately 1:15 p.m., RCSO Detective Patrick Bauer ("Det. Bauer") replaced Det. Moger in monitoring Defendant in the Blue Room.  (Bauer Deposition; Gov. Opp. at 2.)  Det. Bauer affirms under penalty of perjury that, sometime after his arrival in the Blue Room,[1] Defendant asked him questions concerning: (1) the nature of the charges that might be brought against him, (2) whether Defendant was "going to White Plains to see a judge because the Sheriffs and the Feds arrested him;" and (3) whether Det. Bauer "had ever arrested anyone with a large amount of drugs." (Bauer Deposition.)  In response, Det. Bauer disavowed knowledge of what Defendant "was being charged with" or "anything about [Defendant's] situation," advised Defendant that "the Detectives

---

[1]    Defendant asserts in his Memorandum of Law that the statements exchanged between Det. Bauer and Defendant occurred "at approximately 13:15 hours (1:15pm)." (Def. Mem. 4.)  This approximation of the time at which Defendant exchanged statements with Det. Bauer may be based on the Bauer Deposition, which states that Det. Bauer relieved Det. Moger at "approximately 1315 hrs."  (Bauer Deposition.)  The Bauer Deposition goes on to state that Defendant asked him questions "*while* doing constant observation on Estime."  (*Id.* (emphasis added).)  The Gov. Opp. also does not pinpoint an exact time when the exchange occurred.  (Gov. Opp. 2.)  Based upon the present record, it is unclear whether the interaction between Det. Bauer and Defendant occurred immediately upon Det. Bauer's arrival, or sometime afterwards.

that arrested him would let him know what was going on," and informed Defendant that he had arrested people with drugs on them during vehicle stops. (*Id.*) Det. Bauer also affirms that, after this colloquy, Defendant told him that "[Defendant] had a large package of 'stimulants' mailed to him and that's why he was here." (*Id.*) Defendant, by contrast, affirms that he "never told Bauer [that he] 'had a large package of stimulants mailed' to [him]." (Estime Aff. ¶ 14.)

The Government contends that Defendant's questions were not directly solicited by any statements made by Det. Bauer. (Gov. Opp. 2.) Defendant does not make any factual averments concerning his interactions with Det. Bauer besides disavowing the veracity of his purported statement that a large package of stimulants was mailed to him. (*See* Estime Aff. ¶¶ 13-20; Def. Mem. 4.) It is undisputed that Defendant was not Mirandized before or during his interaction with Det. Bauer. (*See* Def. Mem. 3; Gov. Opp. 8 fn. 4.)

Defendant was detained and monitored in the Blue Room from sometime after his arrest at 11:39 a.m., until approximately 5:01 p.m. (Def. Mem. 4.) During this time, Defendant affirms that he experienced physical discomfort, including shivering, as a result of being in a small windowless cold room, "wearing a short sleeve t-shirt," and being "handcuffed to a chair." (Estime Aff. ¶ 17-18.) By Defendant's own account, and based on the videotaped interrogation, he was provided with a blanket which he draped over his body sometime before 5:01 p.m. (*Id.* ¶ 20; ECF No. 23-4 (Videotaped Interrogation) at 5:01:10-15.[2]) Besides his physical discomfort, Defendant did not know whether anyone was taking care of his 4-year old daughter in his absence, as he affirms that he was planning, prior to his arrest, to pick up his daughter from her Godmother's house sometime between 1 p.m. and 1:30 p.m. (Estime Aff. ¶ 8.) Defendant further affirms that he: (1) asked to call his sister in order to see if she could care for his daughter in his absence, (2) was initially denied

---

[2]     All timestamps refer to the timestamp in the videotaped interrogation submitted by Defendant as Exhibit D to the Motion.

permission to make a call, (3) afterwards received an opportunity to call his sister, (4) failed to reach his sister when he attempted the call, and (5) was told by law enforcement agents that they also (unsuccessfully) tried to call his sister. (Estime Aff. ¶¶ 10-12.)

### C.   Defendant's Miranda Waiver and Interrogation

At approximately 5:01 p.m., Defendant was brought into a different room (the "Interrogation Room") by law enforcement agents. (Def. Mem. 4; Gov. Opp. 3; Videotaped Interrogation at 5:01:10.) Defendant affirms that the Interrogation Room was "larger than the Blue Room [but] also very cold." (Estime Aff. ¶ 19.) At the time Defendant entered the room, his hands were unshackled and he draped a white blanket over his shoulders. (Gov. Opp. 4; Videotaped Interrogation at 5:01:10-20.) As Defendant entered the room, RCSO Detective Kerri Kralik ("Det. Kralik") requested that he sit, and they engaged in the following exchange before Det. Kralik exited the Interrogation Room:

> **Det. Kralik**: It's freezing right - Just do me a favor, just have a seat right there real quick. Thank you. [crosstalk] All good. Thank you so much. Thanks. Thanks, John. All right, this is your stuff? Your jewelry and stuff? Are you tired? You look kind of tired. All right, just give me one second, okay?
>
> **Estime**: Hm hm.
>
> **Det. Kralik**: You want water or anything like that? Nothing? Or a soda?
>
> **Estime**: No, I'm straight.
>
> **Detective Kralik**: Okay, hold on one sec'.

(Videotaped Interrogation at 5:01:10-5:01:47; Def. Mem. 6.) Subsequently, Defendant sat silently alone in the Interrogation Room for approximately seven minutes before Det. Kralik and Homeland Security Investigation Special Agent Ronald Hansen ("SA Hansen") entered the Interrogation Room and sat at the opposite side of the table from Defendant. (*Id.* at 5:01:10-5:08:14; Gov. Opp. 3.)

Upon entering, at approximately 5:08 p.m., Det. Kralik and SA Hansen introduced themselves to Defendant, offered him a beverage, and asked if he wanted anything else. (*Id.* at 5:08:20-39.) Defendant declined their offer. (*Id.*) Det. Kralik and SA Hansen then asked Defendant to state his name, residence, and employment. (*Id.* at 5:08:40-5:09:30.) Defendant provided the requested information, including that he resides part-time in Rockland, NY and part-time in New Jersey, and works as a rapper. (*Id.*). Immediately after this exchange, Det. Kralik told Defendant that she was aware of his questions to Det. Bauer in the Blue Room and told him that she must Mirandize Defendant prior to addressing any of those questions:

> **Det. Kralik**: Okay. So I'm sure you have a lot of questions right? [crosstalk] I know you're asking one of my partners, he didn't know much about it. He just... He works...
>
> **Estime**: I don't know nothing about it. That's why I'm like...
>
> **Det. Kralik**: So in order for us to... I just got to do paperwork with you. You see this on TV all the time, okay? I'm going to do your Miranda really fast, and you can ask me whatever questions, we'll tell you why you're here, all that kind of stuff, we'll get your side of the story, and we'll go from there.
>
> **Estime**: [inaudible].

(*Id.* at 5:09:31-5:09:59.) Afterwards, Det. Kralik and Defendant discussed his educational background, and Defendant responded that he graduated from high school and attended Sullivan County Community College. (*Id.* at 5:10:10-5:10:28.)

At approximately 5:10 p.m., Det. Kralik handed Defendant a one-page form that contained, in part, written *Miranda* warnings, an acknowledgment that the signatory of the form was waiving his rights detailed in the above *Miranda* warning, and a signature block. (*Id.* at 5:10:30-31; ECF No. 24-2 (Gov. Ex. B).) After Det. Kralik handed this form to Defendant, the two engaged in the following exchange:

> **Det. Kralik**: Okay. All right. It's here [places Statement of Rights form in front of Defendant]. So, I'll just read along with you. So, you obviously read and write English. Here

is a pen. So, every time you just read one, you just initial there that you understand it. Okay? Just like on TV. So, do you need me to read it to you?

**Estime**: Hm hm.

**Det. Kralik**: You can read and write English, correct?

**Estime**: So, I'm being arrested now?

**Det. Kralik**: We're going to talk to you. This is for us to talk to you. Okay?

**Estime**: So, I'm not being arrested at this moment?

**Det. Kralik**: I think it's all going to depend upon what you say and what happens here. I mean, yes, essentially.

**Estime**: I am arrested, right?

**Det. Kralik**: Yes, of course you're under arrest. Yes. You're under arrest. So it's... Before we ask you any questions, it's my duty to advise you of your rights. Do you understand that?

**Estime**: Why do I have to sign this though?

**Det. Kralik**: Just initial there. It's for us to talk to you. It's just like on TV. [Estime begins initialing next to the Miranda warning] Uh, you have the right to remain silent. You just initial. Anything you say can be used against you in a court of law. You just initial. You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning. And if you cannot afford a lawyer, one will be appointed to you. And then if you just want to talk to us, you just have to sign there.

**Estime**: If I want to talk to you guys?

**Det. Kralik**: Yeah. Like if you want to talk right now. The only way for us to talk to you is if we do this paperwork.

**Estime**: Ok.

**Det. Kralik**: So, you just have to sign there [Estime signs the waiver].

**Estime**: I don't like all this signing stuff.

**Det. Kralik**: It's just like on TV. It's exactly what it is.

**Estime**: Then when we sign it, when we sign somewhere, it's like I don't know.

**S.A. Hansen**: Well we're gonna get that out of the way. I hate the paperwork too. It's about 10 after five.

**Det. Kralik**: It's 10 after five, okay. So obviously you're placed under arrest, and it's the Department of Homeland Security. So…

(Videotaped Interrogation at 5:10:30-5:12:20.)  During this exchange, between 5:11:16 p.m. and 5:11:55 p.m., Defendant executed the form by writing his initials next to each of the following statements: (1) "Before we ask you any questions, it is my duty to advise you of your rights;" (2) "You have the right to remain silent;" (3) "Anything you say can be used against you in a court of law;" (4) "You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning;" and (5) "If you cannot afford a lawyer, one will be appointed to represent you free of charge prior to any questioning."  (*Id.* at 5:11:16-5:11:55; Gov. Ex. B.) Defendant also wrote his signature below the following text: "I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity."  (Gov. Ex. B.)  He did not verbally affirm that he understood his rights or voluntarily waived them during this colloquy.  (Def. Mem. 12; Gov. Opp. 9.)  In his affidavit, Defendant states that he "neither understood the nature of the rights read to [him] 'real fast' by Kralik, nor did [he] fully comprehend the consequences of signing the Miranda form."  (Estime Aff. ¶ 38.)

Following Defendant's execution of the form at approximately 5:12 p.m., until approximately 6:51 p.m., Det. Kralik and SA Hansen questioned Defendant concerning his involvement in narcotics trafficking and the Sham Package.  In the early stages of the interrogation, at approximately 5:18 p.m., SA Hansen asked Defendant to help law enforcement identify exculpatory evidence—*e.g.*, internet browser history demonstrating that Defendant intended to purchase a legitimate dominos board rather than a dominoes board containing cocaine—before being interrupted by Det. Kralik, who favored a less roundabout interview tactic:

**SA Hansen:**  Where did you order the table from?

**Estime:**  Where did I?  Where did the table come from?  Online.

**SA Hansen**:  Online where?

**Estime**: That's how I did it.

**SA Hansen**:  I know. Like what website?

**Estime:**  Something.  I don't know.

**SA Hansen**: I'm trying to help you, Carlo.  I'm trying to help you right now because what I think that is there might be in your phone some evidence that you're right that if you went on a website if you went online you could show me your order history or your emails like 'hey, here's your dominos table,' right?  It's in there.  Always.  So I'm just trying to like lead you to the evidence that is that you're going to be able to give to us that shows that this is just a table like a totally legitimate [crosstalk].

**Det. Kralik**:  We're not doing that actually.  We're not doing that.  We already know… We already know everything, we're not doing that, we're not going to go back and start. We already know.  We're not doing that with you right now because I don't have 5 hours like I don't and you don't either and I'm sure you don't want to be here all night.  So…So…So let's just.  I can't tell you everything. I know everything.  I know all of it. I know exactly what you wanted.  What was in there.  What you were expecting.  How you guys communicated.  How it started.  All of it.  I know all of it.  Okay?

**Estime**:  How did what start?

(Videotaped Interrogation at 5:18:01—5:19:41.)

Following this exchange, an unidentified RCSO detective ("RCSO Det.") entered the room and discussed the status of attempted communications with Defendant's sister (whom Defendant had hoped would pick up his daughter):

**RCSO Det.**:  Your kid.  Your kid needed to be picked up.  Right?

**Estime**: Yeah, um, it's past six.  I guess she should be all right right now.

**RCSO Det.**: So the person that you had them call never answered.

**Estime**: My sister.

**RCSO Det.**: So she never answered.

**Estime**: She.  I called her back, she never picked up either.  I don't know.

**RCSO Det.**:  So like is your kid…

> **Estime**: I don't know, that's what I'm saying.  I don't know.  I have to call my sister.
>
> **RCSO Det.**: Okay.  [inaudible]
>
> **Estime**: She should be good.  But I was in the middle of a conversation.
>
> **Det. Kralik**: Yeah.  We're fine.  We're fine.

(Videotaped Interrogation at 5:19:48-5:20:18; Estime Aff. ¶¶ 32-33.)

Following this interaction, Defendant is alleged to have made several admissions including that he: (1) "knew the [package containing cocaine] was being sent to him from people he knew in the Dominican Republic;" (2) "expected the [package] to contain 100 to 150 grams, not more than a 'kilo;'" (3) believed that the quantity of narcotics he sought to import was insufficient to meet requirements for federal prosecution; and (4) tried to sell cocaine on the day of his arrest.  (Def. Ex. B at CE_000132.)  Throughout the interrogation, Defendant also frequently denied being involved in narcotics distribution.  (*See, e.g.*, Videotaped Interrogation at 5:26:27-43 (Estime: "You want me to give you somebody else's name . . . I really don't know . . . I'm so clueless in this."); *id.* at 5:27:29-31 (Estime: "I wasn't going to sell it at all.").)

### D.     Evidence Offered Voluntarily to Government by Jean-Pierre

At, or around, the same time that Defendant was arrested and interrogated, Jean-Pierre was arrested, Mirandized, and provided evidence to law enforcement officers concerning the provenance of the Sham Package and his interactions with Defendant.  (Def. Ex. B at CE_000132.)  While in custody, Jean-Pierre told law enforcement officers that: (1) "Estime had told [him] that Estime was going to have a package delivered to Jean-Pierre's home" and (2) "[a]fter accepting delivery of the [package], [he] opened the box to see what was inside.  When Estime arrived to retrieve the package, [Estime] was angry with [him] for opening the box."  (*Id.*)  Jean-Pierre also "signed a form indicating that he consented to law enforcement officers searching [his cellphone]" and "showed law enforcement officers text messages that, according to Jean-Pierre, were between Jean-Pierre and

Estime.  In those messages, Estime asked Jean-Pierre for his address, Jean-Pierre told Estime when the [package] arrived, and Estime replied that he was on his way over." (*Id.*)

A cellphone record extraction report, submitted as Def. Ex. A, contains similar communications as the text messages Jean-Pierre showed law enforcement officers. (*See, e.g.*, Def. Ex. A at CE_000109-10 (reflecting a text message exchange between Defendant and Jean-Pierre in which Jean-Pierre advises Defendant that "Yo shit here" at 11:03 a.m. on August 8, 2019, and that Defendant responded "pullin up" at 11:10 a.m.).)  Defendant concedes that the cellphone extraction report contains communications between Defendant and Jean-Pierre. (Def. Mem. 17.)

### E.    The Warrant Authorizing Search of Defendant's Cellphones

In connection with Defendant's arrest, on August 8, 2019, law enforcement seized two cellphones from Defendant's person: (1) a rose gold iPhone with IMEI 353094102870587 and (2) a grey iPhone with IMEI 353289077130617.  (Gov. Opp. 14; Def. Ex. B. at 2.)  One of these cellphones is associated with a phone number ending in 6766 (the "6766 Cellphone"), whereas the phone number associated with the other phone ("Defendant's Second Cellphone") is not established in the record.  (Def. Mem. 17; Gov. Opp. 28.)

On or about August 21, 2019, the Government submitted an application for a search and seizure warrant requesting authorization to search both of Defendant's cellphones along with Jean-Pierre's cellphone.  (Def. Ex. B.)  In support of probable cause, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Matthew Sansone ("SA Sansone") attested to the following facts:

- A package containing cocaine, addressed to Jean-Pierre at the Jean-Pierre Premises, was interdicted by CBP on August 5, 2019.  (*Id.* at CE_000130-31.)

- The contents of the package were substituted with a sham material.  Then, on or about August 8, 2019, the Sham Package was delivered by a law enforcement agent dressed as a delivery person to Jean-Pierre.  (*Id.* at CE_000131.)

- Approximately one hour after the delivery was made to Jean-Pierre, Defendant arrived outside the Jean-Pierre Premises, entered the Jean-Pierre Premises, and exited shortly thereafter carrying the opened Sham Package. (*Id.*)

- Following his arrest, Jean-Pierre told law enforcement officers that: (1) Defendant told him that he was going to have a package delivered to the Jean-Pierre Premises; (2) After accepting the delivery, he opened the box to see what was inside, and, when Defendant arrived to retrieve the package, Defendant was angry with him for opening the box. (*Id.* at CE_000132.)

- Following his arrest, Defendant told law enforcement officers that: (1) he "knew the [Sham Package] was being sent to him from people he knew in the Dominican Republic;" (2) he "expected the [Sham Package] to contain 100 to 150 grams, not more than a 'kilo;'" (3) he asked law enforcement officers what weight would make this a federal case and what would happen if he had shipped stimulants to his home; (4) he stated that he "thought he had been below the federal level;" and (5) he said that he had tried to sell cocaine on the day of his arrest. (*Id.*)

- At the time of his arrest, Defendant possessed the 6766 Cellphone and Defendant's Second Cellphone. (*Id.*)

- Jean-Pierre consented to a law enforcement search of his cellphone, and revealed a text message exchange between Defendant and Jean-Pierre in which he advised Defendant that the Sham Package arrived and Defendant responded that he was on his way over to the Jean-Pierre Premises. (*Id.* at CE_000133.)

In addition to submitting these factual averments in support of the search warrant application, SA Sansone also opined that, among other things, and based on his training, experience, and involvement in the underlying investigation: (1) individuals who are engaged in narcotics trafficking often use cellphones to "communicate with co-conspirators regarding the transportation and distribution of narcotics and narcotics proceeds;" (2) individuals engaged in narcotics trafficking "often store data on their phones related to their criminal activities, which can include logs of online chats, emails, contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts, and personal financial information;" (3) "where smart phones are used in furtherance of criminal activity, evidence of the criminal activity can often be found months, if not years, after the phone is recovered;" and (4) "individuals engaged

in narcotics trafficking often communicate with their suppliers and customers over long periods of time before narcotics are purchased, sold, or released on commission." (*Id.* at CE_000133-34.)

Thereafter, and on the same day, the Honorable Lisa Margaret Smith approved the search warrant. (ECF No. 23-3 (Def. Ex. C).) The warrant authorized the search of the 6766 Cellphone, Defendant's Second Cellphone, and Jean-Pierre's cellphone. (*Id.* at CE_000126.) The scope of the search is limited to a review of the ESI contained on the cellphones for evidence concerning: (1) "the identity of locations of the owner(s) or user(s) of the Subject Devices;" (2) "Carlo Estime's or Caleb Jean-Pierre's participation in the Subject Offenses;" and (3) "the identity or location of, and communications with, co-conspirators, or other persons involved in committing the Subject Offenses in cooperation with the owner(s) or user(s) of the Subject Devices, including messages, call logs, search history, location history, logs of online 'chat,' email correspondence, travel history, transaction history, photographs, videos, calendar or other scheduling information, social media posts, and address book/contact information, including telephone numbers, email addresses, and identifiers for instant messaging and social medial [sic] accounts." (*Id.*)

The search warrant also commanded law enforcement officers to execute the warrant on or before September 4, 2019, (*id.* at CE_000124), and contained a provision relating to the terms of the return of the seized cellphones, (*id.* at CE_000127.) That provision states, in full:

> If the Government determines that the Subject Devices are no longer necessary to retrieve and preserve the data on the devices, and that the Subject Devices are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Devices, upon request and in no event later than 60 days from the date of the seizure unless additional time is granted by court order. Data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

(*Id.*)

After the search warrant was granted, the Government attempted to access the ESI contained in the cellphones.  (Gov. Opp. 14-15.)  The Government contends that it has not been able to access the ESI stored in the cellphones because Defendant's cellphones are locked, Defendant has not provided it with the passwords to access the phone, and efforts to unlock the cellphones have been unsuccessful to date.  (*Id.*)

## II.    Procedural History

On August 9, 2019, a criminal complaint was filed, charging Defendant with one count of conspiring to distribute and possessing with intent to distribute controlled substances in violation of 21 U.S.C. § 841(b)(1)(B).  (ECF No. 1.)  Defendant appeared before the Honorable Paul E. Davison and was detained on consent without prejudice.  (ECF No. 2.)  Thereafter, Defendant was formally indicted by a grand jury on October 7, 2019.  (ECF No. 10.)  Count One of that indictment charged Defendant with conspiring to distribute and possessing with intent to distribute controlled substances in violation of 21 U.S.C. § 841(b)(1)(B).  (*Id.*)

On July 20, 2020, pursuant to a briefing schedule endorsed by this Court on June 3, 2020 (ECF No. 19), Defendant filed his first motion.  (ECF No. 21.)  In his motion, Defendant seeks the: (a) suppression of certain statements made to law enforcement; (b) destruction of copies of certain ESI obtained from Defendant's cellphones and return of both cellphones to Defendant; (c) suppression of evidence obtained from Defendant's Second Cellphone because he controverts the underlying search warrant; (d) an order directing the Government to provide pre-trial notice of evidence the Government intends to introduce at trial; and (e) leave to file additional future motions. (ECF No. 21.)  Defendant also seeks a pre-trial evidentiary hearing to determine the voluntariness and admissibility of post-arrest statements which the prosecution seeks to introduce at trial.  (ECF No. 23 at 14.)  The Government opposed Defendant's motion on August 31, 2020 (ECF No. 24), and Defendant filed his reply on September 14, 2020 (ECF No. 26.)

This opinion followed.

**DISCUSSION**

I.   **Defendant's Motion to Suppress**

   A.   **Defendant's Request for an Evidentiary Hearing**

Defendant requested that a hearing be held to present evidence as to why the Court should suppress his post-arrest statements to law enforcement on August 8, 2019 – *i.e.*, (1) his non-Mirandized statements to Det. Bauer in the Blue Room, and (2) his statements to Det. Kralik and SA Hansen in the Interrogation Room between approximately 5:10 p.m. and 6:51 p.m, after being Mirandized.  (Def. Mem. 14.)  In response, the Government argues that Defendant has failed to establish a factual dispute that would warrant a hearing.  (Gov. Opp. 30.)  The Court agrees with the Government as to Defendant's alleged statements made in the Blue Room to Det. Bauer, but disagrees with the Government as to Defendant's statements made in the Interrogation Room between approximately 5:10 p.m. and 6:51 p.m.

"An evidentiary hearing on a motion to suppress ordinarily is required only if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'"  *United States v. Filippi*, No. 12 Cr. 604(RA), 2013 WL 208919, at *9 (S.D.N.Y. Jan. 16, 2013) (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)); *see also United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("A hearing is not required if the defendant's statements are general, conclusory or based on conjecture.").  Although the Government's reliance on "unsworn statements" in its Memorandum of Law may generally not be enough for a court to make a finding of fact, *see United States v. Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. 2005), a defendant nevertheless bears the initial burden of establishing, by an affidavit of someone with personal knowledge of the

15

underlying facts, that there are, in fact, disputed issues of material facts, *Viscioso*, 711 F. Supp. at

745 (citing *United States v. Caruso*, 684 F. Supp. 84, 87 (S.D.N.Y. 1998)).

       i.    *Defendant's Statements to Det. Bauer*

The Government's submissions concerning the voluntariness of Defendant's statements to

Det. Bauer in the Blue Room are largely uncontroverted by Defendant.  The core factual premises

concerning Det. Bauer's interaction with Defendant are established in the Bauer Deposition.  Det.

Bauer affirms that Defendant asked him several questions relating to Defendant's arrest and, after

answering one of Defendant's questions, Defendant told him that "[Defendant] had a large package

of 'stimulants' mailed to him and that's why he was here."  (Bauer Deposition; *see also* Gov. Opp.

2 ("Without prompting, Estime began to ask Detective Bauer questions about his charges.").)  The

Government does not dispute that Defendant had not received *Miranda* warnings during this

interaction, and does not contest that Defendant (who was confined to a small room and was

handcuffed to a chair) was in custody for the purposes of *Miranda*.  (*See* Gov. Opp. 8 n.4.)

Defendant also offers an affidavit based on his personal knowledge of the events of August

8, 2019.  (*See* Estime Aff.)  In his affidavit, Defendant seeks to contradict a single aspect of Det.

Bauer's statement – *i.e.*, whether Defendant told Det. Bauer that he had ordered stimulants.  (*Id.* ¶¶

13-16.)  Defendant does not otherwise challenge the Government's account of his statements to Det.

Bauer in either his affidavit or his Memorandum of Law by, for example, stating that Det. Bauer, or

any other law enforcement agent, in any way solicited the remarks he allegedly made to Det. Bauer.

On the basis of these submissions, there is no disputed issue of material fact relating to any

of the factors district courts consider when determining whether a non-Mirandized custodial

statement is admissible under the spontaneous utterance doctrine.  In other words, the parties do not

provide contradicting accounts concerning whether Defendant (1) received *Miranda* warnings, (2)

was in custody for the purposes of *Miranda*, or (3) provided statements to Det. Bauer in response to

purported questioning, or its functional equivalent.  The only disputed factual issue—*i.e.*, whether or not Defendant told Det. Bauer that he had ordered a large package of stimulants—is, at bottom, irrelevant to whether or not his alleged remarks were voluntary.  Accordingly, with respect to material issues of fact, Defendant's "version of events is not inconsistent with that stated" by the Government or as depicted in Det. Bauer's statement.  *See Viscioso*, 711 F. Supp. at 745-46 (concluding that a suppression hearing was not warranted where defendant's "version of the events [was] not inconsistent with that stated in the complaint and the [investigating officer's] affidavit" submitted by the Government).  Because the undisputed record adequately enables this Court to make a finding on whether Defendant's purported statements would be admissible under the spontaneous utterance doctrine, the Court finds that an evidentiary hearing is not required.

ii.    *Defendant's Statements to Det. Kralik and SA Hansen*

A suppression hearing is warranted regarding the voluntariness of Defendant's Mirandized statements made in the Interrogation Room between approximately 5:10 p.m. and 6:50 p.m. on August 8, 2019.  To justify an evidentiary hearing, the defendant "must submit an affidavit by someone with personal knowledge that disputed facts exist." *United States v. Martinez*, 992 F. Supp. 2d 322, 325 (S.D.N.Y. 2014) (*quoting United States v. Noble*, No. 07 Crim. 284, 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008)).  "A bald assertion that a statement was involuntary, for example, could be based on any of a number of factual premises such as coercion, lack of Miranda warnings, or lack of competence. Without specification of the factual basis for such a characterization, the district court is not required to have a hearing." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998).  Defendant has submitted an affidavit establishing, if only barely, that disputed facts exist, and that those disputed facts go to whether law enforcement conduct and the conditions of his interrogation rendered his waiver involuntary.

17

Defendant's affidavit suggests that the conduct of law enforcement and the conditions of his interrogation may have vitiated the voluntariness of his waiver of rights.  Among other things, Defendant states, "[b]efore signing the Miranda form, I understood that I was required to sign the form and did not have a choice, if I wanted to get out of the cold room, find out what my charges were and check on my daughter."  (Estime Aff. ¶ 23.)  This directly contradicts certain facts presented in the Government's submission—*i.e.*, that the room was not sufficiently cold to affect the voluntariness of Defendant's waiver of rights and that Defendant was not concerned with his daughter's well-being due to law enforcement denying him adequate opportunity to contact potential replacement caretakers.  (Gov. Opp. 11 & 12.)

It is arguable that each of the disputed conditions—*e.g.*, whether Defendant was held in a cold room, deprived of sufficient opportunity to contact a family member, and denied information regarding what charges the Government intended to pursue—are, on their own, insufficient to require the suppression of his post-arrest statements, even if Defendant's account were credited as true, under Second Circuit precedent.[3]  However, because *several* conditions are in dispute, and the "reviewing court must consider the totality of all the surrounding circumstances," *United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990) (internal citations omitted), the Court concludes that it is prudent to hold an evidentiary hearing to further develop the factual record to better assess whether the totality of the disputed conditions was sufficient to overbear Defendant's free will.

*** 

---

[3]   For example, Defendant's contention that the voluntariness of his waiver of rights was undermined by Det. Kralik's advice that he needed to sign the *Miranda* waiver form if he wanted to talk to law enforcement and find out his charges may be legally untenable.  *See United States v. Lynch*, 92 F.3d 62, 65–66 (2d Cir. 1996) (finding that law enforcement agent's statement that, if defendant wished to continue making statements and to have questions answered, he would have to sign waiver form was not improperly deceptive or coercive).

In short, the Court DENIES Defendant's request for an evidentiary hearing concerning alleged statements to Det. Bauer, and GRANTS Defendant's request for an evidentiary hearing concerning disputed facts surrounding alleged statements made by Defendant to Det. Kralik and SA Hansen in the Interrogation Room.  It now turns to the substance of Defendant's motion to suppress statements made to Det. Bauer.

### B.   Defendant's Statements to Det. Bauer

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[4]  384 U.S. 436, 444 (1966).  "'[C]ustody' for Miranda purposes is not coterminous with . . . the colloquial understanding of custody."  *United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011).  The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Here, the parties do not dispute that Defendant was in custody.  Instead, the issue is whether there was an interrogation.  Interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of an interrogation amounts to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should

---

[4]  Specifically, under *Miranda*, law enforcement must "advise a suspect that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"  *United States v. Schaffer*, 851 F.3d 166, 173 n.23 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 444).

know are reasonably likely to elicit an incriminating response from [a defendant]." *Id.* at 301. "Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect." *Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).

By contrast, there is no interrogation where a defendant's statements "were not made in response to any purported questioning or its functional equivalent[.]" *United States v. Hashmi*, No. 06 CRIM. 442(LAP), 2009 WL 2496272, at *5 (S.D.N.Y. Aug. 7, 2009). A defendant's voluntary incriminating statements made while the defendant is in custody are admissible. *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970). A "spontaneous or volunteered utterance by a suspect, even though in custody . . . is not the product of custodial interrogation, and is thus not subject to suppression under *Miranda*." *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *15 (S.D.N.Y. Dec. 3, 2015) (citing *United States v. Colon*, 835 F.2d 27, 28, 30 (2d Cir. 1987)).

Here, Defendant seeks to suppress his alleged statements to Det. Bauer in the Blue Room because "[a]ny statements made by Estime to Det. Bauer were made as a result of custodial interrogation and were involuntarily made in violation of Estime's Fifth Amendment rights against self-incrimination." (Def. Mem. 4.) The contention that Defendant's statements were made as a result of a custodial interrogation is not supported by factual averments in Defendant's submissions. For example, Defendant does not specifically contend that Det. Bauer, or any other law enforcement agents, asked him any questions, or otherwise engaged in conduct designed to elicit information from Defendant in the Blue Room. (Estime Aff. ¶¶ 14-15.)

The Government, in response, contends that Defendant's statements to Det. Bauer are admissible pursuant to the spontaneous utterance doctrine because Defendant's statements were made "[w]ithout prompting" from law enforcement agents. (*See* Gov. Opp. 2-3 & 8 n.4.) In support

of this argument, the Government submits the Bauer Deposition in which Det. Bauer affirmed that: (1) "while doing constant observation on Estime, he asked me questions regarding his charges," (2) Det. Bauer responded that he did not know what Estime was being charged with, (3) "Estime asked me if he was going to White Plains to see a judge;" (4) Det. Bauer responded that he did "not know anything about [Defendant's] situation and that [he] had no involvement in it;" (5) Estime "asked [Det. Bauer] if [he] had ever arrested anyone with a large amount of drugs;" (6) Det. Bauer responded that he "had arrested people with drugs on them during vehicle stops;" and (7) "[a]t that point [Defendant] stated that he had a large package of 'stimulants' mailed to him and that's why he was here." (Bauer Deposition.)

In reply, Defendant submitted an affidavit noting that he "wish[es] to correct a statement contained in Det. Bauer's Deposition." (Estime Aff. ¶ 13.) As previously mentioned, the only correction of the Bauer Deposition that Defendant offers is that he "never told Bauer [that he] 'had a large package of stimulants mailed' to [him]." (*Id.* ¶ 14.) Defendant does not otherwise dispute Det. Bauer's characterization of their conversation, or whether the interactions were initiated by Defendant himself.

As the evidence makes clear, while Defendant disputes whether he told Det. Bauer that he had a large package of stimulants mailed to him, there is no dispute that Defendant's interaction with Det. Bauer was not prompted by any questioning, or its functional equivalent, by Det. Bauer. As it is undisputed that Defendant's statements were not made in response to any questioning by Det. Bauer, and that Def. Bauer's only statements to Defendant were in response to questions by Defendant, the Court finds that Defendant's statements to Det. Bauer fall squarely within the spontaneous utterance doctrine. Accordingly, to the extent Defendant is seeking to suppress these statements, his motion is DENIED.

## II.     Defendant's Motion to Destroy Copies of ESI and Return Defendant's Seized Cellphones

Defendant challenges the timeliness and reasonableness of the Government's execution of the search warrant authorizing the search and seizure of his cellphones pursuant to the Fourth Amendment, the terms of the search warrant, and Federal Rule of Criminal Procedure 41(e)(2)(B). He also moves for: (1) the return of his cellphones pursuant to Federal Rule of Criminal Procedure 41(g), and (2) the destruction of any copies of ESI obtained by the Government which are not responsive to the categories of data authorized for seizure by the search warrant. [5]  (Def. Mem. 14-17.)  The Government responds that the terms of the search warrant and recent interpretation of Rule 41(e) by courts in this District compel the conclusion that the search warrant was timely executed, that its prolonged retention of the cellphones is reasonable, and that Defendant is not entitled to the return of his cellphones pursuant to Rule 41(g).  (Gov. Opp. 15-24.)  The Court agrees with the Government.

### A.     Timeliness of the Government's Execution of Search Warrant

The parties' dispute boils down to whether, under Federal Rule of Criminal Procedure 41(e), a search warrant for ESI may be executed solely by taking physical possession of a cellphone.  Both parties agree that a search warrant for ESI must be executed within 14-days of the approval of the search warrant, and that it must be executed by "seizure or on-site copying of the media or information."  (Def. Mem. 15; Gov. Opp. 15.)  The parties disagree as to what qualifies as "a seizure . . . of the media or information."  Defendant implicitly contends that taking physical possession of a cellphone does not amount to the execution of a search warrant.  (*See* Def. Mem. 15 ("[T]he

---

[5]     Defendant's second requested remedy is not ripe because the Government states that it "has not yet retrieved any [ESI] from [Defendant's] phones."  (Gov. Opp. 15 & 25.)  The Court cannot order the destruction of ESI that has not been retrieved.  Accordingly, to the extent Defendant's motion seeks the destruction of ESI obtained by the Government, it is DENIED with leave to renew at a later date.

Government still has not executed the warrant to search Estime's iPhones.").)  The Government

argues that the "mere seizure of the phone" is sufficient to execute a search warrant.  (Gov. Opp.

17.)

The search warrant approved by the Honorable Lisa Margaret Smith commands law

enforcement to "execute this warrant on or before September 4, 2019."  (Def. Ex. C at CE_000124.)

It is uncontested that, before September 4, 2019, the Government had taken physical possession of

Defendant's cellphones and that, to-date, it has not made a copy of, nor reviewed, the ESI contained

in the cellphones.  (*See* Def. Mem. 14; Gov. Opp. 14-15.)  The Government further contends that

"since the warrant was issued, law enforcement agents have been attempting—unsuccessfully—to

unlock Estime's phones." (Gov. Opp. 14-15.)  The Government does not state with specificity when

it first attempted to unlock Defendant's cellphones.

Federal Rule of Criminal Procedure 41(e)(2)(B) provides, with respect to a warrant seeking

ESI, "[t]he time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or

on-site copying of the media or information, and not to any later off-site copying or review."  Fed.

R. Crim. P. 41(e)(2)(B).  The advisory committee's notes to the 2009 amendments clarify that Rule

41(e)(2) was intended to broaden the scope of digital searches to account for, among other things,

difficulties created by encryption:

> Computers and other electronic storage media common contain such large amounts
> of information that it is impractical for law enforcement to review all of the
> information during execution of the warrant at the search location. This rule
> acknowledges the need for a two-step process: officers **may seize or copy the entire**
> **storage medium and review it later** to determine what electronically stored
> information falls within the scope of the warrant.
>
> ...
>
> In addition to addressing the two-step process inherent in searches for electronically
> stored information, **the Rule limits the 10 [14] . . . day execution period to the**
> **actual execution of the warrant and the on-site activity**. While consideration was
> given to a presumptive national or uniform time period within which any subsequent

off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. **A substantial amount of time can be involved in the forensic imaging and review of information. This is due to** the sheer size of the storage capacity of media, **difficulties created by encryption** and booby traps, and the workload of the computer labs.

Fed. R. Crim. P. 41(e)(2)(B), 2009 Advisory Committee Notes (emphasis added).

The majority of courts that have considered the issue agree that, consistent with the language of Fed. R. Crim. P. 41(e)(2)(B) and the advisory committee's notes, the Government does not need to copy the entire storage medium or review the ESI in order to execute a search warrant for ESI. *See, e.g., United States v. Carrington*, 700 F. App'x 224, 232 (4th Cir. 2017) ("[T]he fact that the government did not 'review' the texts on the phone until after the warrant's expiration date is consistent with the warrant itself."); *United States v. Huart*, 735 F.3d 972, 974 n.2 (7th Cir. 2013) ("[U]nder [Rule] 41(e)(2)(B), a warrant for electronically stored information is executed when the information is seized or copied—here, when the [government] seized the phone. Law enforcement is permitted to decode or otherwise analyze data on a seized device at a later time."); *United States v. Sosa*, 379 F. Supp. 3d 217, 223 (S.D.N.Y. 2019) ("[T]he subsequent extraction of the iPhone data beyond the 14 days set forth in the warrant is entirely consistent with and specifically contemplated by Rule 41."); *United States v. Pinto-Thomaz*, 352 F. Supp. 2d 287, 312 (S.D.N.Y. 2018), *reconsideration denied*, No. 18-CR-579, 2019 WL 1460216 (S.D.N.Y. Jan. 10, 2019); *United States v. Carpenter*, No. 18-CR-362, 2018 WL 6933160, at *4 (E.D.N.Y. Dec. 28, 2018); *United States v. Alston*, No. 15-CR-435, 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016); *but see United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) ("[T]he Fourth Amendment requires the government to complete its review, *i.e.*, execute the warrant, within a 'reasonable' period of time."). The majority of these courts have also determined that a search warrant for ESI is executed upon the seizure of the physical storage medium, *e.g.*, a cellphone. *See Carrington*, 700 F. App'x at 232

(finding search warrant executed because phone was in custody of government); *Huart*, 735 F.3d at 974 n.2 (same); *Pinto-Thomaz*, 352 F. Supp. at 312 (same); *Alston*, 2016 WL 2609521, at *3 (same).

At least one court has deemed a search warrant for ESI executed once the government sent "the Devices to an off-site facility for copying and review."  *Carpenter*, 2018 WL 6933160, at *5. While it may be best practice for the Government to take initial measures to effectuate the copying and review of ESI—such as by sending a storage medium to the relevant off-site facility for copying and review—within 14-days of the issuance of a search warrant, there is no language in Rule 41(e)(2)(B) that makes this mandatory.  Accordingly, this Court agrees with the majority of courts that, under Rule 41(e)(2)(B), a search warrant for ESI is executed through "the seizure . . . of the media" which is accomplished when the physical storage device is in the custody of the government.

Here, it is uncontested that the Government had physical possession of Defendant's cellphones on August 8, 2019.  (Def. Mem. 14; Gov. Opp. 14.)  Pursuant to Rule 41(e)(2)(B) and the interpretation of most courts, the Government effectively executed the search warrant at that time.  Thus, the Government's execution of the search warrant occurred before September 4, 2019, and was timely.

### B.    Reasonableness of Government's Retention of Defendant's Cellphones

Separately, Defendant argues that, pursuant to the Fourth Amendment, the Government has failed to complete its review of Defendant's ESI in a reasonable period of time.  (Def. Mem. 15-16.) The Government responds that its ongoing delay in completing its review of ESI is the result of difficulties created by encryption, and that retaining a cellphone for 10-months, or more, under those circumstances is not unreasonable.  (Gov. Opp. 19-20.)

"The touchstone of the Fourth Amendment is reasonableness."  *United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).  Although searches performed pursuant to a warrant "will rarely require any deep inquiry into reasonableness," *United States v. Ganias*, 824 F.3d

199, 209 (2d Cir. 2016) (en banc) (*quoting United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)), "the reasonableness of government conduct in executing a valid warrant [ ] can present Fourth Amendment issues," *id.*

"There is no established upper limit as to when the government must review electronic data to determine whether the evidence falls within the scope of a warrant." *Metter*, 60 F. Supp. 2d at 215; *see also United States v. Lustyik*, 57 F.Supp.3d 213, 230 (S.D.N.Y. 2014) ("Like all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable and law enforcement officers therefore must execute a search warrant, including when applicable review of recovered electronic communications, within a reasonable time.") (citation and internal quotations omitted)).  Courts have previously determined that delays of 10 months, or more, in reviewing electronic data are not *per se* unreasonable, even when the government does not furnish a basis for the delay in searching electronic data.  *See, e.g.*, *Sosa*, 379 F. Supp. 3d at 222 (finding delays of 10 and 15 months were reasonable, even though government furnished no basis for the delay, when search was ultimately completed three months prior to defendant's scheduled trial); *United States v. Burns*, No. 07 CR 556, 2008 WL 4542990, at *9 (N.D. Ill. Apr. 29, 2008) (finding a delay of 10 months in searching computer data was not unreasonable even though it "was certainly lengthy and the government does not give any reason for the delay"); *United States v. Gorrell*, 360 F.Supp.2d 48, 55 n. 5 (D.D.C.2004) (finding a delay of ten months in processing computer data to be lengthy, but not so long as to "take the data outside the scope of the warrant such that it needs to be suppressed").  By contrast, the government may not "seize and image electronic data and then retain that data with no plans whatsoever to begin review of that data to determine whether any irrelevant, personal information was improperly seized." *Metter*, 860 F. Supp. 2d at 215.

Here, the Government explains that its delay in reviewing the ESI contained in Defendant's cellphone is the result of difficulties created by the encryption.  (Gov. Opp. 19-20.)  By offering this explanation, the Government provides a more meritorious basis for the delay than the government did in other aforementioned cases where similar delays were deemed reasonable.  *See, e.g., Sosa*, 379 F. Supp. 3d at 222.  Moreover, the basis offered for the delay—*i.e.*, "difficulties created by encryption" (Gov. Opp. 20)—has been credited by the advisory committee when it noted that "[a] substantial amount of time can be involved in the forensic imaging and review of information" because of "difficulties created by encryption."  Fed. R. Crim. P. 41(e)(2)(B), 2009 Advisory Committee Notes.  Defendant offers no allegation of misconduct by the Government in its review of ESI such as, for example, that Defendant was unnecessarily maintaining possession of irrelevant ESI outside the scope of the search warrant.  While the ongoing delay of ten-months is certainly lengthy, and nothing in this opinion should not be interpreted by the Government as an invitation to delay efforts to access the ESI contained in Defendant's cellphones, the current delay is not unreasonable, and does not furnish a basis to suppress evidence obtained from Defendant's cellphones.

### C.      Defendant's Request for the Return of his Cellphones under Rule 41(g)

Defendant contends that, pursuant to the terms of the search warrant, and Rule 41(g), Defendant is entitled to the return of his cellphones.  (Def. Mem. 16-17.)  The Government responds that neither the search warrant nor Rule 41(g) require the return of his cellphones at this juncture because it has encountered difficulties accessing the ESI.  (Gov. Opp. 21-24.)

The search warrant states, in relevant part:

> If the Government determines that the Subject Devices are no longer necessary to retrieve and preserve the data on the devices, and that the Subject Devices are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Devices, upon request and in no event later than 60 days from the date of the seizure unless additional time is granted by court order.

27

(Def. Ex. C at CE_000127.)   The parties offer two distinct interpretations of this provision. Defendant argues that he is entitled to the return of the cellphones *upon his request* based on the language stating that Defendant's property will be returned "upon request and in no event later than 60 days from the date of the seizure."   (Def. Mem. 15.)   Defendant further claims that the Government has not complied with the "upon his request" requirement because he "requested return of the iPhones many months ago" and the "request was denied by the Government." (*Id.*) Defendant does not argue that the obligation to return the cellphones was triggered by the lapse of 60 days after the date of seizure; he instead contends that the seizure has not yet occurred. (*Id.*) The Government responds that the requirement to return of the cellphones is not triggered by the lapse of 60 days from the date of the seizure or by Defendant's request for the return of the property alone.  It argues that the obligation to return the cellphones is conditioned upon a determination that "the Subject Devices are no longer necessary to retrieve and preserve the data on the devices." (Gov. Opp. 22.)

Defendant's interpretation of the search warrant is fatally flawed because he ignores the conditional language at the beginning of the operative sentence—*i.e.*, "[i]f the Government determines that the Subject Devices are no longer necessary to retrieve and preserve the data on the devices . . .".  Under Defendant's construction, the Government's determination that the cellphones are necessary to retrieve and preserve the data on the devices could never prevent Defendant from successfully compelling the immediate return of his cellphones, even if Defendant's request occurred on August 22, 2019, *i.e.*, one day after the search warrant was approved.  The Court rejects this interpretation, and holds that the express text of the search warrant requires the Government to return Defendant's cellphones only after it has determined that the cellphones are no longer necessary to retrieve and preserve the ESI contained therein.

Separately, Defendant argues that he is entitled to the return of his cellphones pursuant to Rule 41(g).  (Def. Mem. 16-17.)  The Government responds that, Rule 41(g) does not mandate the return of Defendant's cellphones because Defendant has not established that the seizure of his cellphones was illegal or that Government's need for the evidence has ended.  (Gov. Opp. 21-22.)

Pursuant to Rule 41(g), "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."  Fed. R. Crim. P. 41(g).  "Although a district court has general supervisory powers over federal law enforcement officials within the district pursuant to which it can order the return of property, it should generally decline to exercise these powers in a manner that could impede law enforcement officials in conducting their investigations."  *Podlog v. United States*, No. S2 92 CR. 374(JFK), 1996 WL 403029, at *1 (S.D.N.Y. July 18, 1996) (internal citation omitted).  Thus, a request for the return of property may be denied if "the government's need for the property as evidence continues."  *Id.* (quotation and internal citation omitted); *see also* Fed. R. Crim. P. 41(g), 1989 Advisory Committee's Notes ("If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.").  Recognizing the need to balance the property rights of the moving party with the legitimate investigatory or prosecutorial needs of the government, the moving party bears the burden of demonstrating, by a preponderance of the evidence, that "(1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended."  *Pinto-Thomaz*, 352 F. Supp. 3d at 311; *see also* 3A Charles Alan Wright *et al*., Federal Practice and Procedure: Criminal § 673 (4th ed. 2019) ("On a motion to return the burden is on the moving party to show that he or she is entitled to lawful possession of the property.  The party who carries the burden need do so only by a preponderance of the evidence.").

As an initial matter, there does not appear to be any disputed factual record upon which the Court must take evidence. The Government has represented that it still requires the seized cellphones in order to access the ESI contained in the cellphones and obtain evidence that it seeks to use at trial. (Gov. Opp. 21.) Defendant has not offered any factual basis upon which it could be determined that the Government no longer requires the possession of the cellphones—*e.g.*, that government has already made a copy of the data contained on the cellphones—and solely takes issue with the prolonged period of time in which the Government has maintained custody of the cellphones. (Def. Mem. 16.) On the basis of the undisputed record that Government has not yet accessed the ESI, the Court finds that Defendant has not met its initial burden by a preponderance of the evidence of establishing that the Government's need for Defendant's cellphones no longer exists.

While the Government presently has an ongoing need to obtain (or acquire) evidence from Defendant's cellphones, it seems to concede that it would no longer need to possess the cellphones after it has accessed and copied the ESI. (*See* Gov. Opp. 24 ("If Estime would like his phones back, he can simply provide the Government with the passwords.").) This recognition is consistent with the admonition of the advisory committee that Rule 41(g) "recognizes that reasonable accommodations might protect both the law enforcement interests of the United States and the property rights of property owners and holders. In many instances documents and *records that are relevant to ongoing or contemplated investigations and prosecutions may be returned to their owner as long as the government preserves a copy for future use*." Fed. R. Crim. P. 41(g), 1989 Advisory Committee's Notes (emphasis added). Should the Government unlock Defendant's cellphones and copy the ESI contemplated in the search warrant, Defendant is granted leave to renew this motion for return of property at a later date.

*** 

In short, Defendant's motion is DENIED except that Defendant may renew its motion seeking the return of property and/or destruction of ESI under Rule 41(g) at a later date.

### III.   Defendant's Motion to Controvert Portions of the Search Warrant and Suppress Evidence Obtained from Defendant's Second Cellphone

Defendant argues that evidence obtained from Defendant's Second Cellphone must be suppressed because probable cause had been vitiated by the Government's review of Jean-Pierre's text messages, which purportedly establish that Jean-Pierre only ever exchanged text messages with Defendant's 6766 Cellphone.  (Def. Mem. 18.)  The Court disagrees.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  "The Supreme Court has explained that 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'"  *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (*quoting Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  When evaluating whether probable cause exists in a case, a judge must "'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (*quoting Falso*, 544 F.3d at 117).

Given the initial subjective standard, "a reviewing court generally accords substantial deference to the finding of an issuing judicial office that probable cause exists, limiting [the] inquiry to whether the office had a substantial basis for his [or her] determination."  *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (citation and internal quotations omitted).  That deference, however, is limited, and it is within the reviewing court's purview to "'decide whether the magistrate

performed his [or her] neutral and detached function on the facts before [them], and did not merely serve as a rubber stamp for conclusions drawn by the police.'"  *United States v. Cardona*, No. 14–CR–314 (RA), 2015 WL 769577, *4 (S.D.N.Y. Feb. 24, 2015) (*quoting United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)).  The essential "'task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination.'"  *Lustyik*, 57 F. Supp. 3d at 224 (*quoting United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011)).

A.    **Probable Cause Regarding Defendant's Involvement in Narcotics Trafficking Conspiracy**

In the present case, the totality of the circumstances afforded the federal magistrate a substantial basis for making the determination that there was probable cause to believe that the Defendant was involved in a conspiracy to distribute controlled substances.  The search warrant application sets forth the sequence of events leading to Defendant's arrest which provided more than enough evidence for the magistrate judge to conclude that Defendant had ordered a package containing cocaine to be delivered to Jean-Pierre on his behalf and intended to take possession of the narcotics.

First, on August 5, 2019, a package addressed to Jean-Pierre at the Jean-Pierre Premises and containing cocaine was seized by CBP on August 5, 2019.  (Def. Ex. B at CE_000130.)  Then, on August 8, 2019, after law enforcement replaced the cocaine with a sham powder, the Sham Package was delivered to Jean-Pierre.  (*Id.* at CE_000131.)  After the package arrived, Jean-Pierre sent a text message to one of Defendant's cellphones stating that the package had arrived, and Defendant replied that he was on his way over.  (*Id.* at CE_000133.)  While surveilling the Jean-Pierre premises, approximately one hour later, Defendant arrived and entered the home.  (*Id.* at CE_000131.)  While in the Jean-Pierre premises, Defendant noticed that the Sham Package was opened and expressed

anger towards Jean-Pierre for opening the package.  (*Id.* at CE_000132.)  Subsequently, Defendant exited the Jean-Pierre premises in possession of the Sham Package.  (*Id.* at CE_000131.)  After his arrest, Jean-Pierre told law enforcement that Defendant had told him he was going have a package delivered to Jean-Pierre's home.  (*Id.* at CE_000132.)

Even excluding Defendant's post-arrest statements, the admissibility of which are the subject of a pending evidentiary hearing, the totality of circumstances provided a substantial basis to conclude that Defendant was engaged in a conspiracy in which he first ordered controlled substances in the mail to be delivered to Jean-Pierre and then retrieved the controlled substances from Jean-Pierre soon after delivery.

### B.      Probable Cause Supporting the Search of Defendant's Second Cellphone

Defendant argues that, regardless of whether probable cause existed to support the seizure of Defendant's 6766 Cellphone, the Government did not have "reason to believe that any evidence is contained on [Defendant's Second Cellphone] 'concerning Carlo Estime's or Caleb Jean-Pierre's participation in the Subject Offenses.'"  (Def. Mem. 17-18.)  In support of this argument, he notes that Jean-Pierre provided the Government access to his cellphone, and that Jean-Pierre's cellphone "reveals that Estime and [Jean-Pierre] only communicated by [Jean-Pierre]'s iPhone and [the 6766 Cellphone]."  (*Id.*)   There does not appear to be any reasonable dispute that: (1) Defendant's 6766 Cellphone contained communications with Jean-Pierre in which they discussed the delivery of the Sham Package (Def. Mem. 17; Gov. Opp. 28); and (2) at the time of search warrant application, the Government's access to Jean-Pierre's cellphone could have enabled it to conclude that Jean-Pierre did not receive text messages from, or send messages to, Defendant's Second Cellphone.  (Def. Mem. 17; Def Ex. A.)

"Courts have commonly . . . found probable cause to search cellphones possessed by defendants arrested in connection with ongoing drug-distribution crimes based on the experience of

agents familiar with narcotics trafficking that traffickers commonly use cellphones to communicate in the course of their narcotics distribution, as well as to store relevant information, including the names and contact information of suppliers, purchasers, and confederates." *United States v. Hoey*, No. 15-CR-229, 2016 WL 270871, at *9 (S.D.N.Y. Jan. 21, 2016).  Relatedly, courts have found probable cause to support the search of a cellphone seized incident to an arrest even where the search warrant application did not introduce into evidence *any* specific communications sent from, or received by, the seized phone.  For example, in *United States v. Barret*, a search warrant for a cellphone obtained incident to arrest was supported by probable cause, even though the government did not submit into evidence any communications sent to, or received by, the seized cellphone, on the basis of an affidavit stating: (1) the circumstances leading to the defendant's arrest and (2) the special agents opinion that drug traffickers frequently "store relevant information in their cellular phones." 824 F. Supp. 2d 419, 448-449 (E.D.N.Y. 2011); *see also United States v. Robinson*, No. 16-CR-545, 2018 WL 5928120, at *16 (E.D.N.Y. Nov. 13, 2018) ("[T]he fact that SCPD discovered the phone at the scene of the crime creates a sufficient factual nexus to justify the search."); *United States v. Lam*, No. 05 Cr. 104S, 2006 WL 2864019, at *5 (W.D.N.Y. May 23, 2006), *report and recommendation adopted sub nom. United States v. Tran*, 2006 WL 2884144 (W.D.N.Y. Oct. 4, 2006).

Thus, even assuming that no text messages were exchanged between Defendant's Second Cellphone and Jean-Pierre's cellphone, the magistrate judge still had a substantial basis for it's determination that Defendant's Second Cellphone would contain evidence, fruits, and instrumentalities of a narcotics conspiracy based on: (1) the evidence of Defendant's participation in a controlled substance trafficking conspiracy and (2) the opinions offered by SA Sansone.  As mentioned above, Defendant's Second Cellphone was retrieved from his person in connection with

his arrest and there was a substantial basis to conclude that Defendant was involved in a controlled substances trafficking conspiracy.  (Def. Ex. B at CE_000130-132.)  Furthermore, SA Sansone offered his opinion, based on his training and experience, that individuals engaged in drug trafficking "often use cellphones (like the Subject Devices), to, among other things, communicate with co-conspirators regarding the transportation and distribution of narcotics and narcotics proceeds." (*Id.* at CE_000133.)  SA Sansone also stated that individuals involved in narcotics trafficking typically store relevant information on their cellphones.  (*Id.* at CE_000133-34.)  Given this record, the Court affirms the magistrate judge's conclusion that probable cause existed to search Defendant's Second Cellphone.

Accordingly, Defendant's motion to controvert the search warrant as to Defendant's Second Cellphone and suppress evidence obtained as a result of the seizure of Defendant's Second Cellphone is DENIED.

## IV.   Defendant's Motion for Pre-Trial Notice of Rule 404(b) Evidence the Government Intends to Offer at Trial

Defendant seeks an order, pursuant to Fed. R. Evid. 404(b), requiring the Government to provide Defendant with notice, at least 30 days prior to trial, of extrinsic evidence that it intends to offer pursuant to Rule 404(b) to establish the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  (Def. Mem 18.)  While Rule 404(b) does not specifically define how far in advance notice must be provided, "[c]ourts in this Circuit have held that two or three weeks['] notice is reasonable[, but] a longer period may be appropriate, depending on the circumstances." *United States v. Vaid*, No. 16-CR-763, 2017 WL 3891695, at *13 (S.D.N.Y. Sept. 5, 2017) (internal quotation marks omitted) (citing *United States v. Rivera*, No. 16-CR-175, 2017 WL 1843302, at *1 (S.D.N.Y. May 08, 2017).  Although Defendant

has not offered a basis for why this longer period is appropriate, the Government does not oppose this motion, and states that it "plans to provide such notice at least 30 days before any trial."

Accordingly, Defendant's motion is GRANTED, and Government is hereby ordered to provide Defendant with notice, at least 30 days prior to trial, of extrinsic evidence that it intends to offer pursuant to Rule 404(b).

## V.    Defendant's Motion for Leave to Make Such Other Motions as May be Appropriate

Defendant seeks a reservation of rights to "make such additional motions as may become necessary as this case proceed towards trial." (Def. Mem. 19.) This motion is DENIED without prejudice as premature because, pursuant to Southern District of New York Local Criminal Rule 16.1, "[n]o motion addressed to a bill of particulars or any discovery matter shall be heard unless counsel for the moving party files in or simultaneous with the moving papers an affidavit certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court and has been unable to reach agreement." The Court will evaluate new motions as they are filed.

## CONCLUSION

For the foregoing reasons, Defendant's motions are GRANTED in part and DENIED in part. Defendant's motions are denied insofar as he seeks: (1) suppression of Defendant's post-arrest statements to Det. Bauer; (2) suppression of Defendant's post-arrest statements to Det. Kralik and SA Hansen at this time; (3) the return of Defendant's cellphones and destruction of ESI contained in Defendant's cellphones; (4) suppression of evidence obtained from Defendant's Second Cellphone; and (5) leave to make such other motions as may be appropriate. Defendant's motions are granted only to the extent he seeks: (i) an evidentiary hearing concerning the voluntariness of Defendant's post-arrest statements made to Det. Kralik and SA Hansen between 5:10 p.m. and 6:51 p.m.; and (ii) an Order requiring Government to provide Defendant with notice, at least 30 days prior

to trial, of extrinsic evidence that it intends to offer pursuant to Rule 404(b).  Defendant is permitted to renew his motion for the return of his cellphones and destruction of irrelevant ESI at a later date. Accordingly, the parties are directed to appear, via teleconference, at their next status conference on October 16, 2020 at 11:00 a.m. for the purposes of scheduling an evidentiary hearing on the outstanding issues related to this motion.

The Clerk of Court is directed to terminate the motions at ECF No. 21.

Dated:    October 14, 2020                                       SO ORDERED:
           White Plains, New York

                                                NELSON S. ROMÁN
                                     United States District Judge